1  DONALD AMAMGBO, ESQ.
   AMAMGBO & ASSOCIATES
2  7901 Oakport Street, Suite 4900
   Oakland, California 94621
3  Telephone: (510) 615-6000
   Facsimile: (510) 615-6025
4
   REGINALD TERRELL, ESQ.
5  THE TERRELL LAW GROUP
   Post Office Box 13315, PMB #148
6  Oakland, California 94661
   Telephone: (510) 237-9700
7  Facsimile: (510) 237-4616

8

9                    UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11

12  DWAYNE WIGGINS, individually and on        )  CASE NO.:
    behalf of all others similarly situated,    )
13                                               )
                                                 )  **CLASS ACTION COMPLAINT**
14                       Plaintiff,              )
                                                 )  DEMAND FOR JURY TRIAL
15  v.                                           )
                                                 )
16  GUITAR CENTER, INC. and NATIONAL             )
    ASSOCIATION OF MUSIC MERCHANTS,              )
17  INC.,                                        )
                                                 )
18                                               )
                         Defendants.             )
19                                               )
                                                 )
20                                               )
                                                 )
21                                               )
22  _____)

23       Plaintiff Dwayne Wiggins ("Plaintiff Wiggins") against defendants, herein contends the

24  following upon personal knowledge as to facts pertaining to himself and upon information and

    belief as to all other matters:

25                          **NATURE OF THE ACTION**

26       1.     Plaintiff Wiggins is a consumer and direct purchaser of a guitar, guitar

27
28  strings and amplifier from Defendant Guitar Center, Inc., ("Defendant GC").  Plaintiff Wiggins,

CLASS ACTION COMPLAINT                                                    1

brings this action on his own behalf and on behalf of purchasers of musical instrument products such as acoustic and electric guitars, violins, amplifiers and strings ("MIP") between January 1, 2004 and December 31, 2007 from defendants.

2.     Plaintiff Wiggins seeks damages from Defendants pursuant to Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Plaintiff Wiggins contends Defendants GC and the National Association of Music Merchants ("NAMM") and its members, conspired to maintain, implement and or enforce a Minimum Advertised Pricing Policies ("MAPP") which had the purpose and effect of fixing prices, securing higher price levels, restricting retail price competition and eliminating price discounting altogether in the fretted instruments market ("MIP").

3.     Specifically, from 2000-2007, NAMM organized meetings and programs where competing MIP retailers, including Defendant GC, openly discussed and made agreements concerning, but not limited to, the restriction of retail price competition; strategies for the adoption, implementation and enforcement of minimum advertised price policies and; appropriate and optimal retail prices and margins. NAMM facilitated resale price maintenance ("RPM") agreements between and among its members.

4.     The NAMM meetings led to agreements between Defendant GC, other leading MIP retailers, and MIP manufacturers to devise a RPM scheme designed to raise and maintain retail prices for MIP.

5.     The conduct of the defendants, and each of them, named herein, violates Section 1 of the Sherman Act. The conduct of defendants, and each of them, unreasonably restrained trade in the relevant market(s) (defined below), causing substantial anti-competitive effects and inflated prices to consumers.

6.     Absent defendants' anti-competitive conduct, Plaintiff Wiggins and the other class members would have paid lower prices for the MIP they purchased during the class period. Plaintiff Wiggins thus seek damages and equitable relief pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 (a) and 25, for violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

## II.    JURISDICTION AND VENUE

7.     The court has jurisdiction over claims concerning violations of the Sherman Antitrust Act of 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C.   Jurisdiction is also proper pursuant to 28 U.S.C. § 1332(d) (2).

8.     Venue is proper in this judicial district pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391.  Defendants transact business within this district, many of the acts and events giving rise to this action occurred within this district; and defendant GC is headquartered into this district.

## III.    PARTIES

9.     Plaintiff Wiggins is a resident of Alameda County, California.  During the class period, Plaintiff Wiggins purchased guitars, guitar strings and amplifiers from the Defendant GC.

10.     Defendant Guitar Center, Inc. ("Defendant GC") is a Delaware corporation with its principal place of business in Westlake Village, California.  Defendant GC is a retail seller of MIP and is a member of NAMM.  Defendant GC has grown aggressively through acquisitions.  Defendant GC is the only national MIP retailer in the nation and is viewed as dominant in the retail market with over 295 stores and also the industry's largest MIP mail order operation.

CLASS ACTION COMPLAINT                                                                                            3

11.     According to Defendant GC's publicly filed financial reports in 2007, it is the largest customer of many of its suppliers and thus each manufacturer depends on Defendant GC for a substantial portion of its MIP sales.

12.     Defendant National Association of Music Merchants, Inc. ("NAMM") is a New York corporation with its principal place of business in Carlsbad, California.

13.     NAMM is a trade association compromised of more than 9,000 members, including defendant GC, which includes manufacturers, distributors, and dealers of MIP. NAMM is controlled by its members.

14.     The MIP market is characterized by significant barriers to entry which enhanced Defendant GC's dominance and influence and has allowed Defendant GC to exercise and maintain control over prices of said products.

15.     Plaintiff Wiggins is informed and believes and thereon contends that as to all transaction relevant herein, each defendant was an agent of one or more defendants named herein and, as such, was acting within the purpose, course and scope of said agency. Plaintiff Wiggins is further informed and believes that each defendant aided and abetted, and acted in concert with and or conspired with each and every defendant to commit the acts complained of herein and to engage in a course of conduct in the business practices complained of herein.

16.     Various individuals, partnerships, corporations and associations not named as defendants in this complaint have participated as co-conspirators in the violations of law alleged herein and have performed acts in furtherance thereof.  The identity of all co-conspirators is unknown at this time and will require discovery.

## IV.   **INTERSTATE TRADE AND COMMERCE**

17.     The activities of Defendants, as described in this complaint, were within the flow of, and substantially affected, interstate commerce.

18.     During the time period covered by this complaint, Defendant GC and members of Defendant NAMM sold and or distributed MIP throughout the United States.

19.     Defendant GC and members of Defendant NAMM have sold and distributed MIP in a continuous and uninterrupted flow of interstate commerce to customers in states other than the states in which the Defendants and NAMM's members produced MIPs.

## V.     SUBSTANTITIVE ALLEGATIONS

### A.     During the Class Period, NAMM was the Industry's Vehicle to Control Prices In the United States Musical Instrument Product Market

20.     Most U.S. manufacturers, distributors, and dealers of MIPs are members of NAMM. As the FTC observed in its March 4, 2009 press release entitled *National Association of Music Merchants settles FTC Charges of Illegally Restraining Competition,* "NAMM serves the economic interests of its members by, among other things, promoting consumer demand for MIPs, lobbying the government, offering seminars, and organizing trade shows. In the United States, NAMM sponsors two major trade shows each year, where manufacturers introduce new products and meet with dealers and competing manufacturers, distributors and retailers of musical instruments meet and discuss issues of concern to the industry."

21.     On information and belief, from the late 1990s to at least 2007, Defendants worked to facilitate uniform agreement concerning the implementation and enforcement of RPM and pricing. The purpose of facilitating agreement concerning RPM

policies and pricing was because Defendant GC, and other retailer members of NAMM were

concerned about increased competition from Wal-Mart, Costco, and assorted internet retailers.[1]

22. By the early 2000s, several major music retail chains, including Defendant GC, were expressing a heightened concern for margin and profit protection.

23. According to independent retailers, Defendant GC wields enormous power in the industry.

24. Thus, when Defendants GC and NAMM encouraged and required the implementation of MAP pricing, manufacturers did so for fear of losing Defendant GC as a customer.

25. In fact, a major shift in retail opinion regarding the effectiveness of MAP policies to protect profits occurred between 2000 and 2001.

26. Music Trades concluded that the 20-point shift in opinion was due to the fact that "the biggest benefit of MAP policies has been to rid the internet of loss-leader pricing." Music Trades explained:

27. In addition to reducing competition from internet retailers, Music Trades also credited MAP policies with a more "sane approach to industry pricing," stating that "retail margins appear to have stabilized."

28. Thus, MAP policies were a hot topic at the January 2001 NAMM trade show.

29. In response to this joint retailer pressure, at the January 2001 NAMM show, manufacturers became more sensitive to retail profit concerns by publishing new and more restrictive MAP policies. However, on information and belief, and the manufacturers

realized and agreed that the MAP policies were not designed to increase services at the retailers but merely to protect their profit margins. In fact, manufacturers allegedly "were fulsome in their criticisms of the industry's retail network," stating, *inter alia* "They didn't do any marketing," and "Their stores are staffed with minimum wage idiots."[2]

30.     The result of the January 2001 NAMM show, and the discussions facilitated by NAMM at that show, was that manufacturers realized they could no longer rely on brilliant engineering and design, but instead agreed to implement a distribution scheme that enables retailers to make a respectable profit.

31.     At the January 2002 NAMM Show, NAMM continued to facilitate discussion among its members on the optimal use of MAP policies. Because, manufacturers acknowledged the retail concern with profitability by instituting minimum advertising price, or MAP policies. In fact, mention of MAP pricing was routinely included in just about every new product presentation.

32.     At these shows, NAMM encouraged dealers to and dealers agreed to and did outline their MAP policies. The MAP policies were agreed to at the behest of Defendants and rolled out at the NAMM shows with the retailer profitability in mind.

33.     NAMM not only encouraged individual dealers and or retailers to discuss and agree how to restrict price competition. It facilitated joint discussions by all members of NAMM. At NAMM's biannual trade shows and conventions, NAMM hosted "NAMM Show University Sessions." These sessions were designed to facilitate discussion and education on a wide variety of music industry topics, including price competition and restrictions to competition.

---

[2] "Brick and Mortar Gets New Respect," Music Trades (March 1, 2001)

34. At the January 2006 trade show, NAMM hosted several sessions regarding MAP policies, pricing and how to enforce MAP policies.

35. MFE explained that the formulas were designed to permit "[f]ormula discounts from retail start[ing] at zero" and to provide a "much higher" profit percentage for lower-priced products."[3]

36. NAMM organized meetings and programs for its members at which competing retailers of musical instruments, as well as manufacturers of those instruments, were permitted and encouraged to exchange information and discuss strategies for implementing minimum advertised price policies, the restriction of retail price competition, and the need for higher retail prices.

37. Representatives of NAMM-sponsored events, NAMM members discussed the adoption, implementation, and enforcement of minimum advertised price policies; the details and workings of such policies; appropriate and optimal retail price and margins; and other competitively sensitive issues.

38. At these NAMM –sponsored events, NAMM members discussed the adoption, implementation, and enforcement of minimum advertised price policies; the details and workings of such policies; appropriate and optimal retail price and margins; and other competitively sensitive issues.

**B. No Legitimate Business Reason for Minimum Advertised Price Policies, Price Restrictions and or Discounting Restrictions**

---

[3] "Marketplace realities demand new approach to MAP policies: with fixed costs the same on all merchandise, a sliding pricing scale makes sense." Music Trades (November 1, 2005).

CLASS ACTION COMPLAINT 8

39. Internet based retailers are small companies, relative to Defendant GC and other retail members of NAMM. Internet retailers of MIPs are highly efficient competitors because, among other reasons, their operating expenses are low. This allows them to compete vigorously on price, both with all other retailers including but not limited to internet retailers of MIPs. Thus, when allowed to compete freely, internet retailers' price competition enhances consumer welfare by bringing down prices.

40. By the 2000s, NAMM and its members recognized that the increased popularity of "e-commerce," with its associated increase in price competition, posted a substantial threat to NAMM's members' sales and profits.

NAMM's, and its members', response to internet retailing were both predictable and anticompetitive.

41. NAMM encouraged its members to devise an illegal plan to combat internet retailers by exacting agreements from the manufacturers of MIPs being sold through Defendant GC and NAMM members' stores and or that desired to sell products at their stores to require, on penalty of termination and as a condition of doing business with them, that the manufacturer ensure that its other retailers refrain from discounting.

42. NAMM facilitated the discussion of, and sought and obtained the agreement of its manufacturer members, to impose and enforce MAP policies solely for Defendant GC and its retail members' benefit and not for any legitimate pro-competitive reason.

## C. The FTC Action

43. In March 2009, the Federal Trade Commission ("FTC") issued a cease and desist order to NAMM and at the same time settled the FTC's charges that NAMM had

"permitted and encouraged" acts constituting violations of Section 5 of the FTC Act among its members and that the acts and practices of NAMM "constitute unfair method of competition in or affecting commerce in violation of Section 5 of the Federal Trade Commission Act, as amended 15 U.S.C. § 45."

44.     Specifically, the FTC, after an investigation, alleged that between 2005 and 2007, NAMM organized various meetings and programs for its members, such as defendants herein, at which competing retailers of musical instruments were permitted and encouraged to exchange competitively sensitive information, strategies for implementing minimum advertised pricing and restrictions of retail price competition.

45.     The FTC alleged that the "challenged conduct served no legitimate business purpose and resulted in no significant efficiency benefits.

46.     According to the FTC's complaint, "at meetings and programs sponsored by NAMM, competing retailers of MIPs and other NAMM members discussed strategies for raising retail prices and exchanged information on competitively sensitive subjects such as prices, margins, MAP policies and their enforcement." Furthermore, according to the FTC, similar discussions were held among manufacturers.

47.     The conduct of the defendants was the cause of *supra* competitive price levels for MIPs. Thus, the defendants were able to increase aggregate sales of approximately +/- $150,000 despite a 10% decline in unit sales.

48.     The FTC further alleged no significant pro-competitive benefit was derived from the challenged conduct. After analyzing the type of information involved, the level of detail, the absence of procedural safeguards, and overall market conditions, the FTC

concluded that the exchange of information engineered by NAMM lacked a pro-competitive justification.

49. The FTC has ordered NAMM to cease and desist from:

(a) Entering into, adhering to, enforcing, urging, encouraging, advocating, suggesting, assisting and or otherwise facilitating any Musical Product Manufacturer and or Dealer to enter into, adhere to or enforce any combination, conspiracy, agreement or understanding between or among any Musical Product Manufacturers and or Dealers concerning:

    (i) the retail price of any Musical Product;

    (ii) any term, condition or requirement upon which any Musical Product Manufacturer and or Dealer, including, but not limited to, price terms, margins, profits, or pricing policies, including but not limited to MAP Policies or Resale Price Maintenance Policies; or

    (iii) The refusal to do business, or the reduction of business, with particular Musical Product Manufacturers and or Dealers.

(b) Urging, encouraging, advocating, suggesting, coordinating, participating in, or facilitating in any manner the exchange of information between or among Musical Product Manufacturers and or Dealers concerning:

    (i) The retail price of Musical Products; or

    (ii) Any term, condition or requirement upon any Musical Product Manufacturer and or Dealer deals, or is willing to deal, with any other Musical Product Manufacturer and or Dealer, including, but not limited to, price terms, margins, profits, or

pricing policies, including but not limited to MAP Policies or Resale Price Maintenance Policies.

(iii)     The refusal to do business or the reduction of business, with particular Musical Product Manufacturers and or Dealers.

(b)     Urging, encouraging, advocating, suggesting, coordinating, participating in, or facilitating in any manner the exchange of information between or among Musical Product Manufacturers and or Dealers concerning:

(i)     the retail price of musical products; or

(ii)     any term, condition or requirement upon which any Musical Product Manufacturer and or Dealer deals, or is willing to deal, with any other Musical Product Manufacturer and or Dealer, including but not limited to, price terms, margins, profits, or pricing policies, including but not limited to, price terms, margins, profits, or pricing policies, including but not limited to, price terms, margins, profits, or pricing policies, including but not limited to MAP Policies or Resale Price Maintenance Policies.

## D.     Anti-competitive Effects of Defendants' Unlawful Conduct

67.     The MAP policies imposed and enforced by defendants here went well beyond typical cooperative advertising programs where manufacturers place restraints on the prices dealers may advertise in advertisements funded in whole or in part by the manufacturer.

68.     The MAP policies inflicted on music retailers by NAMM and manufacturers are anti-competitive. According to a WALL STREET JOURNAL Report dated October 23, 2008, Bradley Reed, sales manager for Musician's Advocate, Inc. said "it [his company] had very little choice but to honor manufacturer's policies on advertised prices

CLASS ACTION COMPLAINT                                                                                        12

because otherwise it risks having its supplies cut off or being delisted as an authorized distributor."

69.     In large part, NAMM's concerted efforts were successful.  Despite that fact that NAMM and its members expressed their fear at the January 2001 NAMM trade show that the then-current gross margins of 27% to 32% would be chipped away even further by price competition, a Music Trades report published in 2008 provided that the music industry had gross margins of 30% versus approximately 22% gross margins for consumer electronics.

70.     Defendants' practices have had the following anti-competitive effects, among others, in the relevant marker:

(a)     Competition in the relevant market has been unreasonably restrained, suppressed, and, in some cases, destroyed:

(b)     Potential competitors have been restrained from entering into the relevant market and have been prevented from competing effectively against defendants;

(c)     Purchasers of musical instruments have been denied the benefits of competition in a free and open market and have been forced to pay artificially high instrument prices;

(d)     Upon information and belief, defendants have enjoyed and will continue to enjoy, ultra competitive profits to the detriment of competitors and purchasers of musical instruments.

71.     The aforementioned anti-competitive effects of defendants conduct on competition in the relevant market outweigh any conceivable pro-competitive benefits.

**E.      Relevant Market**

72.     The relevant product market in this case is retail sales of products in the fretted instruments product category which includes guitars, amplifiers and accessories for same.

73.     The relevant geographic market in this case is the United Sates of America.

74.     By virtue of their power to control prices and exclude competition in the relevant market(s), defendants' at all relevant times possessed market power in the relevant market(s). Moreover, at all relevant times, defendants' possessed dominant shares of the market(s) for retail sales of musical instruments generally fretted instruments in particular.

75.     Likewise, defendants at all relevant times possessed substantial market power in the market(s) for its products, due, in part to, the high level of product differentiation in the industry. Specifically, defendants: (a) sold their musical instruments at prices substantially in excess of marginal costs, (b) enjoyed high profits margins thereon, (c) sold such products substantially in excess of the competitive price, and (d) enjoyed substantial barriers to market entry and growth.

76.     Defendants exchanged competitively sensitive information that had the purpose, tendency and capacity to facilitate price coordination among competitors.

77.     There is substantial concentration among the firms that manufacture products in the relevant market(s).

78.     Defendants together imposed and enforced minimum retail price maintenance and minimum advertised price policies which were contrary to manufacturers' economic interests because each manufacturer rational economic goal was to increase sales volume rather than terminate retailers.

F.     **Market Effects of Defendants' Conduct**

CLASS ACTION COMPLAINT                                                                      14

79.    The overall effect of defendant's anti-competitive, exclusive scheme has been to substantially foreclose and impair competition (and the threat of such competition) from lower-priced musical instruments.  As alleged above, had defendants not improperly foreclosed or stifled actual or potential competitors competing in markets for the musical instruments, other actual or potential rival manufacturers would have achieved much greater sales than they actually did (or threatened to do), given the cheaper prices that they charged (or could have charged upon entry), and would have posed a far greater competitive threat to defendants. Additionally, absent defendants exclusionary conduct, barriers to entry of the markets would have been lower, which (a) would have made it easier for existing or new competitors to enter or expand their positions in the market for the musical instruments, and (b) would have caused existing or potential competitors to be attracted to the musical instrument market because of the supra-competitive prices that defendants was charging.  Because, absent defendants' misconduct, defendants would have rationally perceived that there was a greater threat of potential competition in each of the relevant markets if defendants did no reduce their supra-competitive prices.

80.    The presence of unfettered competition from actual or potential competitors, which were selling lower-priced musical instruments, would have forced defendants to lower the prices for its musical instruments in order to remain competitive and or to counter a perceived threat of additional entry.

81.    Because of defendants' conduct, independent retailers could not compete with nationwide and or multiregional claims because the retailers could not price-compete. Accordingly, retailers such as Defendant GC were able to raise prices above and beyond what they would be under competitive conditions.

CLASS ACTION COMPLAINT                                                                            15

82.     During the relevant period, plaintiff and the other members of the class purchased musical instruments directly from defendants. Because of defendants alleged illegal conduct, members of the class were compelled to pay, and did pay, artificially inflated prices for the musical instruments they purchased. Plaintiff Wiggins would have been able to, *inter alia;* purchase less-expensive musical instruments had potential competitors been able to engage in an unfettered competition. The prices that Plaintiff Wiggins and the other class members paid for musical instruments during the class period were substantially greater than the prices that Plaintiff Wiggins and the class members would have paid absent the illegal conduct alleged herein because: (1) the prices of all musical instruments were artificially inflated by defendants illegal conduct and (2) Class members were deprived of the opportunity to purchase musical instruments at substantially lower prices. Thus, Plaintiff Wiggins and the class have, as a consequence, sustained substantial damages in the form of overcharges.

## IV.     CLASS ACTION ALLEGATIONS

83.     Plaintiff Wiggins brings this action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class:

> All individuals and persons who purchased one or more
> MIPs from any of the defendants from January 1, 2005
> through December 2007 ("Class Period").

Excluded from the class are the defendants, their co-conspirators, their respective parents, subsidiaries and affiliates, any judge or magistrate presiding over this action and members of their families, as well as any government entities.

84.     Plaintiff Wiggins does not know the exact site of the class since such information is exclusively in the control of the defendants. Plaintiff Wiggins believes that there

CLASS ACTION COMPLAINT                                                                16

are thousands of class members and that they are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all class members is impracticable.

85.     Plaintiff Wiggins will fairly and adequately protect the interests of the class. The interests of Plaintiff Wiggins coincide with and are not antagonistic to, those of the class. In addition, Plaintiff Wiggins is represented by counsels who are experienced and competent in the prosecution of complex class action and antitrust litigation.

86.     Plaintiff Wiggins will fairly and adequately protect the interests of the class. The interests of Plaintiff Wiggins coincide with and are not antagonistic to, those of the class. In addition, Plaintiff Wiggins is represented by counsels who are experienced and competent in the prosecution of complex class action and antitrust litigation.

87.     There are questions of law and fact common to the members of the class, and there are common questions predominate over any questions which may affect only individual members of the class, because defendants have acted on grounds generally applicable to the entire class. Among the predominant questions of law and fact common to the class are:

a.     Whether Defendants engaged in agreements, contracts, combinations, and conspiracies, which had the purpose and or effect of unreasonably restraining competition and limiting purchaser access to competing and lower-priced MIP.

b.     Whether Defendants' unreasonably restrained trade;

c.     Whether Defendants' anti-competitive contracts, combinations, and conspiracies have caused Plaintiff Wiggins and the other members of the class or subclasses to suffer antitrust injury in the nature of overcharges;

CLASS ACTION COMPLAINT                                                                                     17

d. Whether Defendants' unlawful conduct caused Plaintiff Wiggins and others class or subclass members to pay more for the MIP than they otherwise would have paid.

e. The appropriate class-or subclass-wide measure of damages; and

f. Whether Defendants' anti-competitive conduct is continuing thus entitling the class or subclass to injunctive relief to promote unrestrained trade and free and fair competition.

88. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims difficulties that may rise in management of this class action. There are no difficulties likely to be encountered in the management of this class action that would preclude its maintenance as a class action and no superior alternative exists for the fair and efficient adjudication of this controversy on behalf of plaintiff and the members of the class.

## VII. TOLLING OF THE STATUTE OF LIMITATIONS, FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

89. Plaintiff Wiggins did not discover and could not have discovered through the exercise of reasonable diligence the existence of the claims sued upon herein until the FTC issued a press release in March 2009.

90. Any applicable statutes of limitation have been tolled by Defendants' affirmative acts of fraudulent concealment and continuing misrepresentations.

CLASS ACTION COMPLAINT 18

91.     Because of the self-concealing nature of Defendants' actions and their affirmative acts of concealment, Plaintiff Wiggins and the class or subclasses assert the tolling of any applicable statutes of limitations affecting the claims raised herein.

92.     Defendants continued to engage in the deceptive practice, and consequently, unwary consumers were injured on a daily basis by Defendants' unlawful conduct. Therefore, Plaintiff Wiggins and the class or subclasses submit that each instance that Defendants engaged in the conduct complained of herein and each instance that a member of the class or subclass purchased a MI Product constitutes part of a continuing violation and operates to toll the statutes of limitation in this action.

93.     Defendants are estopped from relying on any statute of limitation defense because of its unfair or deceptive conduct.

94.     Defendants' conduct was and is, by its nature, self-concealing. Still, Defendants, through a series of affirmative acts or omissions, suppressed the dissemination of truthful information regarding their illegal conduct, and have actively foreclosed Plaintiff Wiggins and the class or subclasses from learning of their illegal, anti-competitive, unfair and or deceptive acts.

95.     By reason of the foregoing, the claims of Plaintiff Wiggins and the class or subclasses are timely under any applicable statute of limitations, pursuant to the discovery rule, the equitable tolling doctrine, and fraudulent concealment.

## FIRST CLAIM FOR RELIEF
## (VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 1)

96.     Plaintiff Wiggins incorporates by reference all the above allegations as if fully set forth herein.

CLASS ACTION COMPLAINT                                                                                    19

97.     Beginning in 2005, the exact date being unknown to plaintiff and exclusively within the knowledge of defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1)

98.     In particular, defendants combined and conspired to raise, fix, maintain or stabilize the prices of MIP sold in the United States.

99.     Because of defendants' unlawful conduct, prices for MIP were raised, fixed, maintained and stabilized in the United States.

100.     The contract, combination or conspiracy among defendants consisted of a continuing agreement, understanding, and or concerted action among defendants and their co-conspirators.

101.     For purposes of formulating and effectuating their contract, combination or conspiracy, defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including but not limited to:

a.     Participating in meetings and conversations to discuss the prices and supply of Fretted Instrument Products.

b.     Communicating in writing and orally to fix target prices, floor prices, and price margins for Fretted Instrument Products;

c.     Exchanging competitively sensitive information among each other to facilitate their conspiracy, including minimum advertised pricing, strategies for raising retail prices, restricting retail price competition;

CLASS ACTION COMPLAINT                                                                 20

d. Agreeing to manipulate prices, and supply of MIP sold in the United States and in a manner that deprived direct purchasers of free and open competition; and

e. Selling MIP to customers in the United States at non-competitive prices.

102. Because of defendants' unlawful conduct, plaintiff and the other members of the class were injured in their businesses and or property in that they paid more for MIP than they otherwise would have paid in the absence of defendants' unlawful conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Wiggins pray that:

A. The court determines that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, with respect to claims for damages and declaring plaintiff as the representative of the class and his counsel for the class;

B. The court declares the conduct alleged herein to be unlawful in violation of the federal antitrust laws and the common law of unjust enrichment;

C. Plaintiff Wiggins and each member of the class recover the amounts by which the defendants have been unjustly enriched in accordance with state law;

C. Plaintiff Wiggins and each member of the class recover punitive and treble damages to the extent such are provided by the law;

D. Plaintiff Wiggins and each member of the class recover the amounts by which the defendants have been unjustly enriched in accordance with state law;

E. Defendants be enjoined from continuing the illegal activities alleged herein;

F.     Plaintiff Wiggins and the class recover their costs of suite, including reasonable attorneys' fees and expenses as provided by law, and

G.     Plaintiff Wiggins and the class are granted such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable and proper by this court.

## DEMAND FOR JURY TRIAL

Plaintiff Wiggins hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

Dated: 2/5/2010

THE TERRELL LAW GROUP

REGINALD TERRELL, ESQ.

CLASS ACTION COMPLAINT     22